**ROLLER BEARING COMPANY OF AMERICA, Plaintiff,**

*v.*

**BEARINGS, INC., Defendant.**

**Civ. A. No. 30552.**

United States District Court, E. D. Pennsylvania.

March 15, 1971.

**924**

Joseph G. Denny, III, Leonard L. Kalish, Philadelphia, for plaintiff.

Howson & Howson, Philadelphia, for defendant.

## OPINION

JOHN MORGAN DAVIS, District Judge.

This is an action for infringement, 35 U.S.C. § 271(a), of claims 1, 2 and 3 of the United States Letters Patent No. 2,-765,202. This patent was issued on October 2, 1956, pursuant to an application by Victor L. Barr, and others, filed January 25, 1950 (hereinafter referred to as the Barr or '202 patent). The Roller Bearing Company of America (R.B.C.) is the assignee of the Barr patent. Mr. Barr is presently the Vice-President in charge of engineering at R.B.C.

The defendant Bearings, Inc. is a national distributor of anti-friction bearings and maintains a place of business in Philadelphia. Its line includes the cage-type needle bearings manufactured by the McGill Manufacturing Company of Valparaiso, Indiana, and specifically, McGill's CAGEROL series, which are accused of infringing the Barr patent. Another lawsuit was instituted by the plaintiff in the United States District Court for the Northern District of Indiana wherein the McGill Mfg. Co. was named as defendant.[1] This latter action was filed approximately 4½ years after the filing of the action in this District.[2] See P. Ex. 95. However, the latter action has been stayed, pending adjudication of this lawsuit. See P. Ex. 98. Whether our decision should be regarded as res

---

[1]. McGill, through its counsel, has solely conducted the defense of this lawsuit. In addition, it has also indemnified Bearings, Inc. from liability arising from any adverse judgment. See P.Ex. 92. Because of these two factors, the plaintiff has taken the position that there · is complete "privity" between the defendant Bearings, Inc. and McGill. Since this was expressly elevated to the level of an "Issue" and persistently asserted by the plaintiff throughout the course of trial (and during all pre-trial stages, as the file indicates), a finding by the Court is appropriate.

Following the guidelines set forth in Schnell v. Peter Eckrich & Sons, 365 U.S. 260, 81 S.Ct. 557, 5 L.Ed.2d 546 (1961), this Court has neither the statutory venue over McGill, nor any basis

in fact to treat McGill as the *alter ego* of Bearings, Inc., merely on the strength of the two factors recited above. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed. 2d 129 (1969). Having elected to proceed against the distributor rather than the manufacturer, the plaintiff may not now be heard to complain. See Triangle Conduit & Cable Co. v. National Electric Products Corp., 125 F.2d 1008 (3rd Cir. 1942).

[2]. In addition to the Barr patent, the complaint in both actions also asserts infringement of Letters Patent No. 2,884,-288. However, plaintiff's Motion to Sever Trial of the '288 patent (documents 159 and 168) from the '202 patent was granted.

judicata as to the Indiana action against McGill need not be considered by this Court. See e. g. Zenith Radio Corp. v. Hazeltine Research, Inc., supra, pp. 108–112, 89 S.Ct. 1562.

Turning then to the subject matter of this lawsuit, the Barr patent encompasses "Cage Type Roller Bearings and Method of Assembling Rollers Therein."[3] The bearing consists of only three classes of components: the rollers, a race ring and a "cage." The movement of the rollers within the race ring provides the anti-friction function of the bearing. The cage is a continuous piece of resilient metal in cylindrical form, usually steel, which has "windows" or "slots" in a cross-wide axial direction into which the rollers are inserted.

The cage has three principal functions. The "retention" function prevents the rollers from falling out before the bearing has been installed. Secondly, the cage spaces the rollers evenly throughout the race ring. Finally, after the bearing is installed on a shaft, the cage provides its most important function by guiding the rollers in a generally parallel position, while permitting the rollers to rotate within the race ring. The guidance function is important only after the bearing has been installed on a shaft (in contrast to the retention function which is important only when the bearing is *not* installed on a shaft).

In addition, the design of the Barr patent places particular emphasis upon a feature of the cage which is not generally applicable to all cage type roller bearings. Specifically, the patent states, at column 1, line 55, that:

A further and particular object is to provide such a roller bearing which shall have a roller cage of novel and improved construction whereby the cage can be positioned within the race ring and thereafter the rollers can be inserted into the slots in the cage and into the raceway by simple momentary elastic deformation or spring-

ing of the portions of the cage between the roller receiving slots.

This has been described as the "most important feature of the invention" by the patentees. See col. 3, line 70.

Although the plaintiff asserts that over thirty-nine catalog sizes of McGill bearings sold under the CAGEROL trademark are alleged to infringe (see P. Ex. 146), there are essentially only three variations in construction or design.

The first is the straight-bar welded cage bearing, exemplified by the CAGEROL MR–32 (P. Ex. 54E). In this type, the cage is formed from a strip of steel while flat. The strip is stamped or punched out to provide the slots or "windows" into which the rollers will ultimately be placed. The steel strip is then rolled and welded into a cylindrical configuration. As a result of the rolling step, the outer rims of the cage slots will "stretch," while the inner rims of the slots will "compress" in a slight but sufficient amount to result in a tapering of the bars of the cage. In this way, the circumferential spacing between the bars is greater than the diameter of the roller on the outer portion of the cage, but less than roller diameter on the inner portion of the cage. The smaller diameter on the inner portion of the cage performs the retention function.

The second type of representative bearing contains a straight bar cage, made not in the flat and rolled as recited above, but made from a section of steel tubing of appropriate dimension. The CAGEROL MR–48 tube-type (P. Ex. 56 E) is the only accused bearing of this construction. This cage is formed by punching the roller pockets or windows, and then reducing the opening on the inner portion of the cage by deforming or "staking" the metal, thereby partially closing the pockets to less than roller diameter. This permits the cage to retain the rollers.

---

3. Although the patent consists of seven claims, only claims 1, 2 and 3 are alleged to have been infringed; none of the three directly pertain to methods of assembly.

Finally, the CAGEROL depressed-bar welded cage bearing is exemplified by the CAGEROL MR-88 (P. Ex. 59E). In bearings of larger diameter, the bars do not "close" so much merely by rolling a flat piece of metal. To increase the amount of retention, the bars are depressed axially (or inwardly) throughout the major portion of their length.[4]

In each of the CAGEROL bearings recited above, the method of placing the rollers in operational position between race ring and cage, is by "snapping"— i. e., asserting pressure upon the roller in an axial direction until the elasticity of the relatively thin cage temporarily deforms or spreads the steel between .002 to .005 of an inch (the thickness of a hair), thereby permitting the roller to "snap" into place. The elasticity of the steel then permits the cage to return to its former dimension. This technique is commercially preferable, since it lends itself rather well to mass production, both as to facility of assembly, and for quality control.

## FINDINGS OF FACT

1. Plaintiff, Roller Bearing Company of America, is a corporation of the State of New Jersey, and has its principal office at Sullivan Way, West Trenton, New Jersey.

2. Defendant, Bearings, Inc., is a Delaware Corporation and maintains an office at 1607 West Hunting Park Avenue, Philadelphia, Pennsylvania.

3. The complaint herein was filed November 22, 1961, charging defendant with patent infringement by selling certain roller bearings.

4. On October 2, 1956, the '202 patent, entitled "Cage Type Roller Bearings and Method of Assembling Rollers Therein", issued to plaintiff as a result of assignment from the applicants, Victor L. Barr, Karl L. Herrmann, and Gerald A. Henwood. Plaintiff is now the owner of said Letters Patent and is entitled to maintain this action.

5. Plaintiff manufactures and sells roller bearings. Defendant is a distributor of roller bearings and related products for manufacturers which it represents, and it maintains establishments throughout the United States for the sale of such roller bearings and related products.

6. McGill Manufacturing Company Inc. of Valparaiso, Indiana, is one of the manufacturers which defendant represents. McGill is not a party to the suit, but has assumed defense of the suit and agreed to hold the defendant harmless with respect to the sale of the CAGEROL bearings which are charged by plaintiff to infringe the '202 patent.

7. In addition to the instant litigation wherein the Complaint was filed on November 22, 1961, plaintiff filed a Complaint on April 26, 1966 in the United States District Court for the Northern District of Indiana in Hammond, against two defendants, McGill Manufacturing Company, Inc. of Valparaiso, Indiana, and Bearings, Inc., the present defendant, who also has a place of business at 432 Perl Street, Fort Wayne, Indiana. On July 22, 1966 plaintiff filed a motion to have this present action transferred to the District Court in Hammond, Indiana. Sitting as the Motion Judge, the Honorable John P. Fullam denied the same on September 26, 1966. Plaintiff's Indiana action was then stayed on February 27, 1968, pending the outcome of this litigation.

*Subject Matter of the '202 Patent.*

8. The subject matter of the '202 patent in suit (P. Ex. 1) is a roller bearing consisting of a race ring with integral flanges, a raceway between the flanges, rollers in the raceway, and a cage having rims riding on the flanges in a land riding relationship, with slots, or windows, or pockets in the cage (as

---

4. The parties have stipulated that the above three bearings, together with the MR-10-N (P.Ex. 58E) and the MR-52 (P.Ex. 57E) would be deemed representative of all the accused bearings. The latter two are merely different sizes of the straight-bar and the depressed-bar types, respectively.

they are variously called in the art and in the patent) defined by bars between the cage rims to contain the rollers in the raceway so as to prevent the rollers from becoming misaligned in such raceway during the operation of the bearing in equipment in which it is installed. Lips or ears on the bars of the cage engage the rollers on the sides thereof away from the raceway to retain the rollers within such cage and race ring when the bearing is not installed in equipment.

9. The specification of the '202 patent consists of the preamble (col. 1 to line 41), a general statement of the nature and the objects of the alleged invention (col. 1, line 41 to col. 2, line 17), a brief description of the drawings (col. 2, line 18 to col. 3, line 2), and a detailed description of the alleged invention (col. 3, line 4 to col. 5, line 22) and the best modes contemplated by the three copatentees in carrying out such alleged invention. The roller bearings are described in terms of a cage structure of resilient material which permits extensive elastic radial deformation of the bars of the cage in order to assemble rollers in the slots formed by the bars of the cage.

10. The application for the '202 patent (P. Ex. 1–W) as filed on January 25, 1950, included independent claims 1, 2, 7, 8 and 9, covering a roller cage, or a roller bearing structure. Each such claim defined the cage as being "composed of resilient material." The remaining independent claim 10 of the application covered a method of assembling rollers and a cage with a race ring, and included the method limitations of "forming said cage of resilient material." and of "temporarily springing the resilient roller-guiding bars in radial planes of the cage, and emplacing rollers between said roller guiding bars while the latter are sprung." (P. Ex. 1–W, pp. 11–14).

11. In the drawings and specification of the '202 patent, three different structural embodiments of the roller bearing of the patent are disclosed, as well as three different methods for assembling the rollers between the race ring and the cage, which are as follows:

| Structural Embodiments | Methods of Assembly |
|---|---|
| (1) Figs. 1 to 9 in the drawings, and col. 2, lines 22–42, and col. 3, lines 3–39, and lines 58–74 in the specification. | (1) Figs. 6, 7 and 8 of the drawings and col. 3, lines 40–57 of the specification. |
| (2) Figs. 10 and 11 in the drawings, and col. 2, lines 43–51, and col. 3, line 75 to col. 4, line 8 in the specification. This corresponds in structure to the bearings of Figs. 1–9 except it is "inside out", i.e. it has an inner race rather than an outer race. | Same as Figs. 6 and 7 as per col. 4, lines 8–12 of the specification. |
| (3) Figs. 12 to 19 in the drawings, and col. 2, line 52, to col. 3, line 2, and col. 4, lines 18 to 30. | (2) Figs. 13 and 14 of the drawings, and col. 4 lines 31 to 49 of the specification. |
| | (3) Figs. 15 to 18 of the drawings and col. 4, line 50 to col. 5, line 22 of the specification. |

12. The two bearing embodiments of Figs. 1–11 (Finding 11) have resilient cage bars which incline inwardly from their ends toward the axial center of the cage, and have central lips or ears, 7, 9, for roller retention (col. 3, lines 22–40). The other bearing embodiment, Figs. 12–19, has straight resilient cage bars with narrowed or cutaway sides, and with central lips or ears 14 for roller retention (col. 4, lines 18–30). This difference in cage bar configuration is the only structural difference described in the '202 patent for the three different bearing embodiments shown therein.

13. The cage for the roller bearing of the '202 patent is formed of inherently resilient steel (col. 3, line 17) having bars which can be elastically deformed in a radial direction sufficiently to permit insertion of rollers in the slots formed by the bars while such bars are so deformed (col. 2, lines 13–17; col. 3, lines 45–55; col. 4, lines 18–30, lines 36–38, lines 54–57).

14. The specification of the '202 patent states (col. 3, line 70) that "the most important feature of the invention is the elastic deformation or springing of the roller-guiding bars of the cage to permit insertion of the rollers and

thereby make possible the use of a race ring having integral end flanges."

15. In plaintiff's '203 patent (P. Ex. 43) at col. 1, lines 43–51 which was filed on September 15, 1950, subsequent to the '202 patent, the patentees state that the '202 patent describes and claims:

* * * one method of assembling the rollers and the cage in a channel-shaped raceway of a roller bearing race ring have integral roller retaining end flanges, said method consisting in forming the cage of resilient material, temporarily springing the resilient roller-guiding bars in radial planes of the cage and slipping rollers endwise between the roller guiding bars between the slots in the cage into rolling contact with the raceway while said bars are sprung.

16. In explaining the alleged invention of the '202 application to the Patent Office Board of Appeals, plaintiff's attorney further emphasized the momentary elastic radial deformation and described it in these terms ('202 File History, pp. 49–50, P. Ex. 1–W):

The invention is embodied in a bearing comprising an outer cylindrical race ring A having end flanges 3; an inner cylindrical race ring B; a series of needle rollers 2 between the race rings and a thin sheet metal Cage C containing slots into which the rollers are *axially* inserted by a momentary elastic *radial bulging* of the cage bars between the slots. These cage bars are oppositely inclined from a central zone (having ears 7 for retaining the rollers) outward to rims which lie in the pitch circle of the rollers * * *

In assembling the bearing, the bars 7 may be sprung by the *leverage* of the rollers 2 (Figs. 6 and 7) or as shown in Fig. 14, a tool 16 may be inserted through an aperture 17 into engagement with the cage bar 12. Pressure exerted through the tool on the bar springs the bar *radially inward* to permit a roller to be inserted *longi-*

*tudinally.* Instead of employing the tool 16 to *radially spring* the bars 12 of the cage, the cage bars 12 may be sprung, during insertion of the cage and rollers into the race ring, by a tool 20 as shown in Figs. 15 and 16 * * * (emphasis added)

17. The assembly of rollers in a cage and race ring according to the methods described and illustrated in the '202 patent can only be accomplished with a cage of sufficiently resilient material to provide the elastic radial deformation of the cage bars to the extent shown in Fig. 7 for the first described method, the elastic radial deformation of the bars to the extent shown in Fig. 14 for the second described method, and the elastic radial deformation of the bars to the extent shown in Fig. 15 for the third described method.

18. The stress of the metal of a cage necessary to permit deformation of the bars in an amount sufficient to assemble rollers as illustrated in Fig. 7 is over 250,000 pounds per square inch; for Fig. 13 is over 550,000 pounds per square inch; and for Fig. 15 is over 350,000 pounds per square inch (N.T. Vol. 25 p. 101, D. Ex. 160).[5]

19. Prior to developing the assembly method of Figs. 3, 6 and 7 in the '202 patent plaintiff tried the assembly method of Figs. 13 and 14 but found that this "wrecked the cage" (N.T. Vol. 28 p. 73), so it formed or filed the bars as in Fig. 19, but realized this was "stupid and difficult" due to the irregular shape of the cage bars (N.T. Vol. 28 p. 75), and went to the inclined bars as shown in Figs. 3, 6 and 7 of the patent.

20. The rollers in the bearing of Figs. 3, 6 and 7 of the '202 patent were retained "only at short zones disposed about centrally of the lengths of the slot walls," because if retention were "all the way along the entire length" of the slot walls, plaintiff "would never get the thing together," for the roller

5. The notes of testimony were given a separate volume number corresponding to each day of trial and will be so stated throughout this Opinion.

For example, N.T. Vol. 13, p. 5.

had to be inserted "from the end, get it under the lip 17 and then slide it in axially" (N.T. Vol. 29 p. 37; N.T. Vol. 2 p. 74).

21. One of the co-patentees, Victor Barr, testified as follows with respect to the object of the '202 patent and the roller retention thereof (N.T. Vol. 29 p. 34):

> The first type cage bearings which we made, which were very few, in accordance with this '202 patent, we were faced with the problem that has always faced manufacturing of full complement bearings, and that is the probability of the rollers falling out. And there had been customers, when we first showed them a cage type bearing, the first thing they would do is throw it on the floor, to see if the rollers will come out. Of course, we didn't want that to happen. That is why I say it was our intention on this '202 patent to have a roller retained in such a way that the customer or a competitor could throw it around the room if they wanted to and the rollers were going to stay in there. That is what I meant by "tightly."

Mr. Barr further testified (N.T. Vol. 29 p. 35): "On the '202 that is why we had depressions in the center or tapered bar to really get down under the roller and hold it in," and contrasted the retention structure shown in the '202 patent with that of the '203 patent (P. Ex. 43) when he stated (N.T. Vol. 29 p. 39):

> Well in the '203 patent, the rollers are inserted individually into the pockets, and we have lateral springing of the bars to let the roller get past the retaining lips, but on this '203 patent we do not have the same amount of

retention that we had in the '202 patent.

22. The title of the '202 patent shows that the method of assembling the roller bearing is intertwined with the structure for specifically practicing such method, and approximately 40% (yellow colored sections in D. Ex 155) of the printed '202 patent specification is devoted to the description of the different methods for assembling the cage and rollers in a race ring. The assembling of a cage and rollers between race flanges in a roller bearing is stated to have been a "perplexing problem" in the prior bearing art (col. 1, line 34), and the patent also states that "one object of the invention is to provide a novel and improved method of assembling the rollers and the cage" in a race ring having integral flanges (col. 1, line 41).

23. Plaintiff has not manufactured commercially any roller bearing as illustrated in the drawings and described in the specification for any one of the three structural embodiments of the alleged invention of the '202 patent, nor has plaintiff commercially assembled any roller bearing according to any one of the three methods illustrated and described therein. The roller bearing defined in the claims in suit has had no commercial success. (N.T. Vol. 22 p. 100, N.T. Vol. 28 pp. 68–70, N.T. Vol. 29 pp. 55 and 41).

*The Accused Roller Bearing.*

24. Plaintiff charges as infringements of the '202 patent the following roller bearings manufactured by McGill Mfg. Co. Inc., and sold by the defendant, as the distributor therefor at some time between October 2, 1956 when the '202 patent issued and the date of filing suit on November 22, 1961:

| MR–10 | MR–10–N | MR–12 | MR–12N | MR–14 | MR–14–N |
| MR–16 | MR–16–N | MR–18 | MR–18–N | MR–20 | MR–20–N |
| MR–22 | MR–22–N | MR–24 | MR–24–N | MR–26 | MR–26–N |
| MR–28 | MR–30 | MR–32 | MR–32–N | MR–36 | MR–36–N |
| MR–40–N | MR–44 | MR–44–N | MR–48 | MR–48–N | MR–52 |
| MR–56 | MR–56–N | MR–60 | MR–64 | MR–68 | MR–72 |
| MR–80 | MR–88 | | | | |

25. Out of the thirty-eight (38) roller bearings of Finding 24 the following were stipulated to be representative for the determination of the issue of infringement for claims 1, 2, and 3 of the '202 patent:

MR–10–N

MR–32

MR–48–N (welded cage)

MR–48–N (tube cage)

MR–52

MR–88

26. All of the bearings of Findings 24 and 25 were sold under the trademark CAGEROL by defendant, and all bearings which plaintiff, in the present action, charges infringe the '202 patent are identified by this trademark.

27. The CAGEROL MR–10–N (D. Ex. 1, P. Ex. 58E), MR–32 (P. Ex. 54EO, and MR–48–N (welded) P. Ex. 55E), types of roller bearings consist of an outer race ring with integral flanges, rollers in the raceway, and a cage for guiding the rollers in the raceway and retaining the rollers in the bearing assembly. Such cage comprises a cylindrical structure manufactured from a strip of sheet metal stamped to provide roller slots or windows, or pockets, as they are variously called, rolled into a cylindrical configuration with the two ends of the strip abutting, and welded at the juncture of the two ends of the strip. Each slot in the cage has walls lengthwise of the slot which are tapered in a direction radially outwardly from the inner surface of the cage to the outer surface thereof so that the circumferential spacing between the bars forming the slot at the inner surface and over the axial length of the slot is less than the diameter of the roller, and the corresponding spacing at the outer surface of the cage adjacent to the raceway of the race ring is greater than the diameter of the roller therein, such tapered configuration for the slot walls being formed coincident with the rolling of the punched flat strip into a cylindrical cage for welding and for the "snap-in" reception of the rollers in the respective slots.

28. The MR–48–N (tube type) (P. Ex. 56E) bearing is a roller bearing consisting of a jointless tube with bar-shaped slots punched in the tube, and a staked configuration along the bars at the inner surface, thereby to spread the metal of each bar so that the circumferential opening of each slot in the cage at the inner surface comprises two edges spaced apart a distance less the diameter of the rollers, thereby facilitating snap-in reception of rollers in the cage and retention thereof in the slot by such edges, with the opening of the slot at the outer surface having a circumferential dimension greater than the diameter of the rollers.

29. The MR–52 (D. Ex. 2, P. Ex. 57E) and MR–88 (P. Ex. 59E) type bearings are provided with a cage formed as a stamped-out flat slotted strip having bars with a depressed portion intermediate to the axial ends of each bar, with the strip being rolled into a cylindrical form as described in Finding 27 for the cage thereof, and providing walls for the slots of the cage which are tapered coincident with the rolling of the strip to provide edges at the inner surface of the cage over the length of each slot that are spaced apart less than roller diameter for snap-in reception and retention of rollers therein, with the walls of the slots guiding the rollers in the slots.

30. The rollers in each of the accused bearings have straight cage bars, i. e. MR–10–N (P. Ex. 50C, also scale drawing D. Ex. 20), MR–32 (P. Ex. 54C, also scale drawing D. Ex. 21) MR–48–N (welded cage) (P. Ex. 55C, also scale drawing D. Ex. 22A) and MR–48–N (tube cage) (P. Ex. 56C, also scale drawing D. Ex. 22B), are retained in the slots in the cage by the material of the bars which defines the slots, and this material extends over the length of the slots, according to the engineering prints therefor. The cage bar material for retention of the rollers in the MR–52 and MR–88 bearings extends over 80% of the length of the bars of the cages, as shown in engineering prints P. Ex. 57C (also scale drawing D. Ex. 23) and P. Ex. 59C (also scale drawing D. Ex. 24) (N.T. Vol. 19 p. 78). In all six such bearings shown in the engineering drawings, spacing between adjacent bars at the roller retaining material thereof is less

than the diameter of the roller retained in the slot by an amount between $\frac{2}{1000}$ of an inch and $\frac{5}{1000}$ of an inch (N.T. Vol. 16 p. 77 and P. Ex. 50C, D; P. Ex. 54C, D; P. Ex. 55C, D; P. Ex. 56C, D; P. Ex. 57C, D; P. Ex. 59C, D). This amount of retention in the accused bearings comprising the amount of interference between roller and cage bar for retention purposes, is the thickness of an ordinary human hair (N.T. Vol. 16 p. 77, N.T. Vol. 21, pp. 65 and 77).

31. In certain physical samples of the accused bearings, there are portions of the pockets wherein the rollers may pass endwise between the retention portions of the bars. These are outside of the engineering print specifications (Finding 30) and such deviations are caused by distortion of the bars through assembly, inaccuracy of manufacture or the particular method of assembly used in a given bearing (N.T. Vol. 14 p. 95, Vol. 15 p. 82, Vol. 18 p. 58, Vol. 25 p. 47). However, with the hair breadth (.002 to .005 of an inch) retention or interference between cage bar and rollers, it is significant to have the retention along the full bar length so that the assembled bearing will withstand handling without the rollers falling out of it (N.T. Vol. 13 p. 67, Vol. 14 p. 82, Vol. 19, p. 102, Vol. 21 p. 36, Vol. 21 p. 64, Vol. 22 p. 12, Vol. 25 p. 32).

*Interpretation of Claims 1–3 in Suit.*

32. Plaintiff introduced testimony to the effect that claims 1 to 3 in suit are all to be interpreted as covering a cage-type bearing employing needle-type rollers. However, there was no such emphasis on needle rollers when the application was filed on January 25, 1950 (P. Ex. 1–W) and the only use of the word "needle" in the entire application, including the original claims, was in the sentence appearing in the patent, column 1, lines 21 to 25, stating that "the rollers are of small diameter, for example, of the needle type". Patent claims 1 and 3 call for "a cylindrical needle roller bearing wherein 'needle' was added to the claims during prosecution, but claim 2 has no reference to 'needle' and calls only for 'a cylindrical roller bearing.'"

33. The entire record in the lawsuit shows that there is no consistently accepted definition in the bearing art of the word "needle" as applied to a cage-type roller bearing (N.T. Vol. 4 p. 78, Vol. 32 p. 46, Vol. 33 p. 23). Roller lengths to diameter ratios from 1.3 and up have been called "needle" rollers (N. T. Vol. 37 p. 34, D. Ex. 181, N.T. Vol. 4 p. 59, D. Ex. 17, N.T. Vol. 34 p. 15).

34. Long prior to the development of the roller bearing of the '202 patent, cage-type bearings were known in the bearing art, and are in evidence here, having rollers with a length to diameter ratio corresponding to any formula which plaintiff has asserted in the present record for the word "needle" as applied to rollers for cage type roller bearings. (D. Ex. 44, 45, 46, 49, 50, 51, 53, 59, 63, 65, 75, 76, 180).

35. Claim 1 of the '202 patent calls the cage bars "resilient" extending along each roller with each bar "connected with both said rims and spaced from one another a distance greater than the diameter of the roller between them throughout at least the greater part of their lengths." The cage so described will separate the rollers from one another but will not retain the rollers in the cage to prevent such rollers from falling away from the raceway and out of the cage when the roller bearing is separated from a shaft or the like (N.T. Vol. 12 p. 128). The retention function is described in claim 2.

36. Claim 2 describes a roller bearing with the cage of "sheet metal" having continuous rims with roller slots spaced apart by bars, with "each slot being of a width slightly greater than the diameter of the roller therein for at least a major portion of its length", and "lips" on the bars "projecting into the slot and spaced apart a distance less than the diameter of the roller in the slot". The lips function to retain the roller in the slot of the cage when the bearing is handled separately from a shaft or the like.

37. Claim 3 describes a roller bearing with a cage of "thin sheet metal", resilient bars in the cage connecting the

rims, the cage rims being "jointless" and "having surfaces engaging the ends of said rollers in the pitch circle." The ears are described as "extending towards said rollers on the opposite side of the axes thereof from said raceway" of the bearing race ring.

38. Each cage of a roller bearing assembly illustrated in the '202 patent has cage slots or pockets defined by bars which perform two independent functions, (1) the retention of the rollers by lips or ears on the bars when the assembly is not installed in equipment, and (2) the guidance of the rollers when the bearing is installed and operating. These two independent functions are aggregative and not cooperative with respect to one another.

*Alleged infringement of Accused Bearings.*

39. None of the accused bearings utilize the cage of the roller bearing in any one of the three embodiments of the '202 patent, such cages and roller bearing embodiments being identified in Findings 11 and 12.

40. None of the accused bearings are assembled according to any one of the three methods of assembly described and illustrated in the '202 patent, such methods being identified in Finding 11 (N.T. Vol. p. 60).

41. Claims 1 and 3 require that the cage have "resilient bars," but none of the accused bearings have resilient bars in the cages thereof as resiliency and deformation is illustrated in the drawings and described in the specification of the '202 patent (N.T. Vol. 21 p. 24, Vol. 21 p. 33, Vol. 21 p. 81, Vol. 21 p. 83).

42. Claims 1 and 2 require that the width of the cage slot receiving the rollers be *greater* than roller diameter for at least a greater part of its length. This is described in col. 3, lines 22–29 of the '202 patent and permits the roller to be inserted end-wise as shown in Fig. 6 or received between the deflected bars as in Figs. 14 and 15 (N.T. Vol. 21 pp. 35–36, Vol. 15 p. 50, Vol. 19 p. 105). The accused bearings have slot widths *less* than roller diameter over all or the major part of the slot length (Findings 30 and 31).

43. Claim 1 requires a cage having rims "tending to contact the ends of said rollers in a pitch circle through the axes of said rollers" and claim 3 requires a cage with "rims having surfaces engaging the ends of said rollers in the pitch circle." This relationship does not exist in the representative bearing MR–88 (N.T. Vol. 21 p. 84, Vol. 21 p. 79, Vol. 18 p. 60).

44. Claims 2 and 3 respectively require that the cage bars have "lips" or "ears" extending in the cage slot. There is no such lip or ear structure in the accused bearings. In the accused bearings the cross-section of the cage bars is rectangular, and the pockets formed by the bars are truncated so that the bar edges of the pockets retain the rollers without the use of the "lips" or "ears" (N.T. Vol. 19 pp. 76 and 77, Vol. 21 p. 43).

45. Claim 3 requires that the cage have "jointless" cylindrical rims. In prosecuting its patent application, plaintiff argued ('202 patent file history, P. Ex. 1–W, p. 58) that the "jointless" rims are distinguished from rolled and welded rims such as in Carlson patent No. 1,764,198 (DX 44). All of the accused bearings with the exception of MR–48–N tube type, have joints in the cage rims which comprise abutted ends of a rolled flat strip which are welded in the abutting relation (N.T. Vol. 25 pp. 83, 84).

46. During the prosecution in the Patent Office of the application which resulted in the patent in suit, the patentees presented application claim 15 (P. Ex. 1–W pp. 29, 30) to a "cylindrical needle roller bearing" with substantially the same structure defined for that bearing as did application claim 13 (which became patent claim 3 in suit), and with a limitation to the bars of the cage "having sections oppositely inclined from points adjacent to said rims to said ears," in accordance with the structure of the patent which plaintiff interpreted to correspond to the accused bearings; the Patent Office Examiner and the

Board of Appeals each, however, refused to allow claim 15 (P. Ex. 1–W p. 70) and the patentees acquiesced in this ruling; thus the plaintiff is estopped now to claim the benefits of the rejected-cancelled claim or an interpretation of patent claims 1 to 3 in suit as would be equivalent thereto.

*Prior Art Relied Upon by Defendant.*

47. In the left hand column the following chart compares the structure of claims 1 to 3 in suit, with the structure of the accused bearing. The right hand columns identify the prior art patents and publications (which contained the same teaching and the corresponding exhibit number for each). The symbol "X" indicates that structure as described is present in the prior art, and the number reference in some boxes indicates a variation from that described in the left hand column.

Prior Art Teaching This Feature

| (1) One Flange (2) Not Integral (3) Attached Flanges (4) No Weld | DX 42 Bott | DX 43 Brodin | DX 44 Carlson | DX 45 Frauenthal | DX 46 Gales | DX 47 Heim | DX 48 Palmgren | DX 49 Reiss | DX 50 Timken | DX 51 Young | DX 55 Blake | DX 59, 60, 61 Herrmann DX 63, 64 Bantam | DX 65, 66 Orange |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Race ring with integral flanges forming raceway. | X | X | | X | (1) | | | X | | (2) | | X | (3) |
| 2. Sheet metal cage punched to form pockets, rolled and welded at a joint. | | | X | X | X | | | (4) | X | (4) | | | |
| 3. Sheet metal cage of tubing with pockets. | | | | | | X | X | | | | X | | X |
| 4. Cage rims jointless. | X | X | | | | X | X | | | | X | X | X |
| 5. Cage rims contact ends of the rollers at pitch circle. | X | X | | X | | | X | | | X | X | X | |
| 6. Cage rims guided on race flanges. | X | X | | X | | | (1) | | | | X | X | |
| 7. Cage bars spaced wider than roller diameter at raceway side of cage and less than roller diameter at side of cage opposite raceway. | X | X | | X | X | X | | | | | | | X |
| 8. Cage bars spaced apart more than roller diameter for majority of bar length. | | | | | | | X | | | X | X | | |
| 9. Lips or ears on cage bars to retain rollers. | X | | | | | | X | | | | | X | |
| 10. Retention structure for snap-in of rollers into cage pockets. | | X | X | | | | X | | | | | | |
| 11. Elastic radial deformation of cage bars for roller insertion. | | | | | | | | | | | | | |

48. The following chart provides more complete information as to all of the prior art identified in Finding 47.

| DX No. | Patent | Inventor | Date Filed | Date Patented | Not Cited By Patent Office | Cited by Patent Office |
|---|---|---|---|---|---|---|
| 42 | 1,765,648 | Bott | 9–9–26 | 6–24–30 | | X |
| 43 | 2,044,663 | Brodin | 2–7–35 | 6–16–36 | X | |
| 44 | 1,764,198 | Carlson | 6–29–29 | 6–17–30 | | X |
| 45 | 2,294,289 | Frauenthal | 8–29–39 | 8–25–42 | X | |
| 46 | 2,288,564 | Gales | 6–25–40 | 6–30–42 | X | |
| 47 | 2,044,168 | Heim | 1–24–31 | 6–16–36 | X | |
| 48 | 2,705,176 | Palmgren | 10–6–49 | 3–29–55 | X | |
| 49 | 2,503,070 | Reiss | 1–19–49 | 4–4–50 | X | |
| 50 | 1,446,487 | Timken | 1–31–22 | 2–27–23 | X | |
| 51 | 1,928,823 | Young | 7–18–29 | 10–3–33 | X | |
| 55 | 1,617,700 | Blake | 3–26–24 | 2–15–27 | X | |
| 59 | 1,963,407 | Herrmann | 6–29–31 | 6–19–34 | X | |
| 60 | 1,966,095 | Herrmann | 11–7–31 | 7–10–34 | X | |
| 61 | 1,971,782 | Herrmann | 9–30–33 | 8–28–34 | X | |

PUBLICATIONS    (None were cited by Patent Office)

| DX No. | Publication | Origin | Date |
|---|---|---|---|
| 63 | Cover page and pages 3, 10, 16, 34, 35 of catalogue "Engineering Data" | Bantam Bearings Corporation | 1934 |
| 64 | Cover page and pages 7, 4, 5, 14, 15, 18, 51, 53, 54, 55, 63 of catalogue "Bantam Ball and Roller Bearings" | Bantam Bearings Corporation | 1939 |
| 65 | Reproduction of ad for Orange Roller Bearing Co., Inc. p. 255 of magazine | Product Engineering Magazine | January 1947 Issue |
| 66 | Brochure entitled "Orange Cage Type Needle Bearings — Engineering Data" | Orange Roller Bearing Company, Inc. | |

49. In addition to the Brodin (D. Ex. 43), the Carlson (D. Ex. 44), and the Palmgren (D. Ex. 48) patents of Finding 47, insertion of rollers in a cage for a bearing by snapping the rollers in with a radial push for retention by cage bars is described in the following prior art (D. Ex. 122) cited by the Patent Office in the '202 application:

A. Andre patent No. 1,395,244, at page 1, lines 94–98.

B. Blomberg patent No. 1,433,340, at lines 47–51.

C. Pew patent No. 1,723,369, Figs. 16–19, and page 1, lines 13–19.

50. Plaintiff had manufactured integral flanged race rings and rollers as elements of a roller bearing before its development of a cage type roller bearing as in the '202 patent. In the roller bearing of the '202 patent, the patentees simply added a cage to such

prior elements to provide a cage-type roller bearing assembly (N.T. Vol. 2, pp. 56, 69, Vol. 1, p. 80, P. Ex. 12, P. Ex. 5, P. Ex. 26).

51. The cage for the '202 patent bearing is described in the specification as having a roller guiding function and a roller retention function. Such two functions are independent of one another, and cages of the prior art perform these two functions in this same manner, as for example in Brodin (D. Ex. 43), Carlson (D. Ex. 44), Frauenthal (D. Ex. 45), Gales (D. Ex. 46), Heim (D. Ex. 47), Herrmann (D. Ex. 59), Palmgren (D. Ex. 48), Reiss (D. Ex. 49), Timken (D. Ex. 50), Young (D. Ex. 51), Bantam '34 (D. Ex. 63), Bantam '39 (D. Ex. 64), Orange (D. Ex. 66).

52. Each and every element of claims 1, 2 and 3 of the '202 patent, and the recited relationships among those elements, as plaintiff interprets such claims for this action, is disclosed in the prior art represented in the bearings of Finding 47, and such elements of the claims perform substantially the same function in substantially the same way as in such prior art bearings (N.T. Vol. 32, p. 51).

53. Claims 1, 2 and 3 in suit describe a bearing with a race ring with flanges (to restrict axial movement of the rollers), a cage which is guided with respect to the raceway, resilient metal cage bars, and rollers in pockets between the bars. Claims 2 and 3 call for lips or ears on the cage bars. Bearings with this structure and relationships were well known in the art evidenced in the patents and publications D. Ex. 42, 43, 45, 46, 48, 55, 59, 60, 61, 63, and 66, and as described in Finding 47.

54. The claims in suit include in varying scope and to a different extent those elements described in Finding 47 as items (1), (3), (4), (5), (6), (8), (9) and (11). Such elements are old as shown in Finding 47, and such claims in suit are for a combination of old elements. If such claims are to escape invalidity they must be restricted to the very specific bearing structures illustrated and described in the '202 patent, and such structures differ materially from each of the accused bearings.

55. The cages of the accused bearings MR–10–N (D. Ex. 1, P. Ex. 58), MR–32 (P. Ex. 54), MR–48–N (P. Ex. 55) correspond in structure to and are formed in the same way as the cage of Gales patent No. 2,288,564 (D. Ex. 46) and as the cage of Timken patent No. 1,-446,487 (D. Ex. 50) and the rollers of the accused bearings are retained and guided in the cages in the same manner as the rollers in the Gales patent (N.T. Vol. 32, pp. 11–13).

56. The cage of the accused bearings MR–52 (D. Ex. 1 and P. Ex. 57) and MR–88 (P. Ex. 59) correspond in structure to and in the method of formation of the cage of Carlson patent 1,764,198 (D. Ex. 44, Finding 46 and N.T. Vol. 32, pp. 7–8), and the rollers of such accused bearings are retained and guided in the same manner as the rollers in the Gales patent (D. Ex. 46).

57. It is obvious to a bearing engineer to employ a sheet metal tubular cage in Herrmann 1,963,407 (D. Ex. 59) instead of the cast cage of this prior art patent, and the cage of the accused bearing MR–48–N (tube type) (P. Ex. 56) otherwise corresponds in structure to such cage of Herrmann. The rollers of such accused bearing are retained and guided in the same manner as the rollers in such prior patent.

58. The claims of the '202 patent read equally well on a combination of either the Gales (D. Ex. 46) cage or the Timken (D. Ex. 50) cage used in either the Frauenthal (D. Ex. 45) bearing, or in the Brodin (D. Ex. 43) bearing or in Herrmann 1,963,407 (D. Ex. 59) bearing, or in the Bantam bearings (D. Ex. 63, 64, 75, 179, and 180).

59. One of the copatentees, Victor L. Barr, knew of the following prior art before he filed the '202 patent application as evidenced by his memo of December 22, 1949 (D. Ex. 15). This memo of Barr includes sketches of prior art roller bearings and includes the follow-

ing statements by Barr with respect to these bearings:

(A) "Pat. No. 2,044,663 Brodin June–1936 Filed—Feb.–1935, Assembly by pressing rolls into cage pocket"

(B) "1,943,894 Johnston Jan. 1934 Filed May 1929 Assembly by pushing rolls into cage pocket"

(C) "1,963,407 Herrman June–1934 Filed—June 1931 Assembly by inserting rolls then locking in by bending lip. This results in a lip almost as long as the roller."

Plaintiff did not cite this prior art to the Patent Office for consideration by the Examiner during the prosecution of the '202 application. (P. Ex. 1–W).

## DISCUSSION

■ An examination and study of the accused bearings with the teachings of claims 1, 2 and 3 of the Barr Patent requires us to conclude that the accused bearings do not infringe. The Barr Patent essentially proposes two different configurations or forms of cages. In the first (exemplified by Fig. 9), the bars of the cages are straight throughout the greater portion of their length. However, the central portions of the bars contain ears, or lips which project into the slot, and spaced apart a distance less than roller diameter.

The second configuration is merely a variation of the above. An examination of Fig. 19 of the Barr patent indicates a cage with tapered, rather than straight bars. This design permits the insertion of the rollers in an axial manner.

In contrast to the two variations of the cage of the Barr patent, an examination of the CAGEROL cage types indicate a substantially different construction and design. Essentially all of the CAGEROL cage slots (into which the rollers are inserted), are straight. There are no "ears" as in the Barr patent. This is significant, since the cage design dictates the method of assembling the rollers within the cage race ring structure.

Another substantial difference is exemplified by Figs. 3, 6 and 7 of the Barr patent. An examination of these drawings shows that the cage bars are slanted inwardly from the rims, so that the roller when inserted, is guided roughly at the pitch circle at its ends (approximate) only; the cage bar is at a point considerably less than pitch circle at its middle. Again, the contemplated method of assembly (by diagonally "sliding" each roller into place end-to-end) of the Barr patent dictates this design.

By contrast the CAGEROL cage is not depressed in an angular manner; it is straight across, a design which is compatible with the method of roller assembly wherein each roller is snapped into place all at once (rather than diagonally sliding it into place, as in the Barr patent).

Parenthetically, we believe that since the depressed bar design of the MR–52 and MR–88 is dictated by the necessity of permitting the cage to perform its *retention* function, in contrast to the *assembly* function which is the basis of the Barr patent depressed bar design, the similarity, if at all, is coincidental and not an emulation of the teaching of the patent.

Another substantial difference is apparent from the contemplated method of construction. Plaintiff's expert testified that the cage in the Barr patent is " * * * made from a tube and consequently, the sides of the pockets are parallel". (N.T. p. 76, Vol. 19). In contrast, the cages of the majority of the CAGEROL bearings are manufactured *in the flat*, and then rolled and welded into the circular configuration. This difference in the technique of manufacture was the subject of particular emphasis in the prosecution of the patent before the Patent Office. In the file history the applicants stated that:

The term 'jointless' aptly describes applicant's tubular rims which are made much more truly cylindrical and with less expense than is involved in bending and welding a blank as in Carlson (prior art). See P. Ex. 1W, p. 58.

Having expressly limited the scope of the invention during the proceedings before the patent office, the plaintiff cannot now be heard to contend that the patent should be given an interpretation sufficiently broad to encompass the rolled and welded construction of the type used in the majority of defendant's CAGEROL bearings. Westinghouse Electric Corp. v. Hanovia Chemical & Mfg. Co., 179 F.2d 293 (3rd Cir. 1949). See also Schmidinger v. Welsh, 383 F.2d 455, 464 (3rd Cir. 1967).

There is also little basis for the notion that the rolled and welded cage is merely a "mechanical equivalent" of the tube-type of cage construction. There has been comprehensive demonstration that two techniques are sufficiently distinct in the manufacturing technique alone to warrant the opposite conclusion—the statement of the patentee before the Patent Office, recited immediately above, would substantiate this observation.

As previously mentioned, the majority of the CAGEROL bearing series utilize a rolled and welded cage. However, the one exception is the MR–48–N tube-type. Although this model is manufactured from a tube as set forth in the Barr patent, other substantial differences such as the lack of "ears" and the lack of depression of the bars, are sufficient to justify a finding of non-infringement, as well.

In addition to the angular insertion method of placing the rollers into the cage/race ring, the Barr patent also discloses two other methods. In the first, a tool is inserted through the oil hole in the race ring, and the bar is physically depressed. The roller is then inserted. See Fig. 13 and 14. Also, the patent discloses a method whereby the cage bars are simultaneously depressed, again with the use of a tool, but before the cage is fully inserted into the race ring. See Figs. 15 and 16.

The methods of assembly shown in the Barr patent are predicated upon the two cage designs depicted in Figs. 9 and 19. In contrast, the CAGEROL bearings con- tain a cage of different design, which contemplate a different method of assembly.

In reviewing the Barr patent as against the bearings accused to infringe, we recognize that it is the claims of the patent and not the drawings contained therein which set out the scope of the patent. Wayne Knitting Mills v. Russell Hosiery Mills, Inc., 400 F.2d 964 (4th Cir. 1968). Although the above discussion principally alludes to the drawings contained in the Barr patent, this is merely intended to be illustrative. The findings of fact, as entered by this Court are directed principally to the claims in suit.

The plaintiff has devoted a substantial amount of trial time (Its "Issue B") in furtherance of its belief that McGill (who, it may be recalled, is not a party to this action) purloined *intentionally* the claims of the Barr patent, in the commercial form of the CAGEROL series bearings. However, it is the accepted rule that the determination of infringement of a patent can be accomplished irrespective of the purpose and intent of the alleged infringer, Thurber Corporation v. Fairchild Motor Corporation, 269 F.2d 841 (5th Cir. 1959); Baut v. Pethick Construction Co., 262 F.Supp. 350 (M.D.Pa.1966), although intent of the infringer would be relevant to the issue of damages. Hartford National Bank and Trust Co. v. E. F. Drew & Co., 188 F.Supp. 353 (D.Del.1960) affirmed, 290 F.2d 589 (3rd Cir. 1961). Our finding that the Barr patent is not infringed by the defendant's CAGEROL series bearings, forecloses further consideration of the matter.

Although our finding of non-infringement controls the legal determination of this case, the issue of validity will also be resolved, in the interest of comprehensiveness, following the rule of this Circuit. Frank W. Egan & Co. v. Modern Plastic Machinery Corp., 387 F. 2d 319 (3rd Cir. 1967). See also Mabs Inc. v. Piedmont Shirt Co., 368 F.2d 570 (4th Cir. 1966).

■ Initially, it is noted that the invention evidenced by the Barr patent can hardly be regarded as a basic or pioneering advance in the technology of anti-friction roller bearings, "* * * as distinguished from a mere improvement or perfection of what had gone before." Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 561, 18 S.Ct. 707, 718, 42 L.Ed. 1136 (1898). As our findings No. 47 and 48 would demonstrate, the art in this field is rather crowded. Accordingly, rather than apply a philosophy of liberality, as where the field is relatively novel, United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 236, 63 S.Ct. 165, 87 L.Ed. 232 (1942), if the art is crowded as in the instant case, " * * * the claims must be certain and definite enough to distinguish the patent from prior discoveries." Corning Glass Works v. Anchor Hocking Glass Corp., 374 F.2d 473 (3rd Cir. 1967).

■ In furtherance of its assertion of invalidity, the defendant has placed reliance on the defenses of lack of novelty, and obviousness as set forth in 35 U.S.C. §§ 101–103. Although we recognize that there is a statutory presumption of validity, 35 U.S.C. § 282, this presumption is substantially weakened when it is apparent that the Patent Office failed to cite much of the relevant prior art. Blumcraft of Pittsburgh v. Citizens and Southern National Bank, 407 F.2d 557 (4th Cir. 1969); Scripto, Inc. v. Ferber Corp., 267 F.2d 308 (3rd Cir. 1959).

The defendant has laid great emphasis upon the Brodin patent (D. Ex. 43), in support of its contention of lack of novelty. Defendants' Exhibits 52A through C compare in a most lucid manner, the claims of the Barr patent with the features of Brodin. (It will be noted also, that Brodin was not cited to the Patent Office). Brodin, filed in 1935, not only contained the principal features set forth in the claim of the Barr patent in suit, but was also sufficiently broad to encompass a "cage for anti-friction bearings." Indeed, its six claims expressly covered ball as well as roller bearings. This fact is significant, since the plaintiff persistently attempted to read the claims of Brodin in a narrow manner; the plaintiff would distinguish Barr from Brodin because the former encompasses "needle roller bearings," while the latter is applied to anti-friction bearings in general. This argument is not very persuasive. Whatever significance may be bestowed on the word "needle"[6] its presence in the Barr patent is not sufficient to distinguish the teachings in Brodin from the patent in suit. A person skilled in the bearing art would have no difficulty in envisaging Brodin in its identical form, but in a different size.

Plaintiff, in attempting to distinguish Brodin, lays great emphasis upon the fact that the Barr patent calls for a cage constructed of "sheet metal" with elastic propensities, where Brodin calls for a cage of bronze or brass. Reading Brodin in context, however, the words "bronze or brass" were evidently intended merely as examples of metals which the patentee regarded as acceptable. Moreover, one can hardly conclude that the terms "sheet metal" and "bronze or brass" are mutually exclusive. Finally, although the term "needle bearing" is contained in claims 1 and 3 (but not in 2),

6. The plaintiff expended several trial days in attempting to elicit a definite description of a "needle" roller bearing. The witness Smith, testifying as an expert, reported that the term "needle" denotes a roller whose length to diameter ratio is somewhere in the vicinity of 2 to 1, but that the common usage in the trade is not precise. In Application of Herrmann, 261 F.2d 598, 46 C.C.P.A. 739 (1958) a ratio of 3 to 1 was adopted. With such diverse interpretations, the Court can only conclude that the term "needle" cannot be given any independent significance in considering whether the prior art relied upon by the defendant can be regarded as germane. In so holding, we are not unmindful of the so-called "skewing" or cocking problem which is prevalent in roller bearings of high length to diameter ratios, but less prevalent (or even nonexistent) in so-called "square" rollers.

there was no elaborate discussion or distinction drawn in any portion of the patent which would disclose to the reader that the patent was restricted to "needle bearings." [7]

The other prior art is most enlightening. Defendant's reliance upon the Herrmann patent (D. Ex. 59) as well as the Bantam bearing depicted in its 1934 and 1939 catalogues (D. Ex. 63 and 64), is well taken, since they do depict the functions of roller guidance and retention as set forth in the claims in suit, notwithstanding that the Herrmann cage was fabricated from cast rather than sheet metal.

Further, an examination of the Timken patent, issued in 1923 (D. Ex. 50) and the Gales patent, issued in 1942 (D. Ex. 46) neither of which was cited by the patent office, would indicate that the cage design of Barr was well established in the industry.

The other examples of prior art have been treated in the numbered findings of fact. Individually considered, they require this Court to conclude that the Barr patent is invalid for lack of novelty and for obviousness.

Regarding counsel fees, we note that only in "exceptional cases," within the meaning of the statute, 35 U.S.C. § 285, shall fees be awarded, Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367 (3rd Cir. 1962); Hardinge Company, Inc. v. Jones & Laughlin Steel Corp., 275 F.2d 37 (3rd Cir. 1960). This trial was unduly protracted. Each side presented its respective position with an unnecessary amount of meticulosity. Notwithstanding this fact however, at no time did the Court observe any bad faith, fraud, undue harassment or other unusually vexatious conduct on the part of the unsuccessful party, which would warrant the finding of an "exceptional circumstance". Accordingly, counsel fees are to be borne by the respective parties. AMP Inc. v. Burndy Corp., 332 F.2d 236 (3rd Cir. 1964).

Similarly, we see no reason to award costs. Both sides engaged in lengthy depositions in various locations extending from the Eastern Seaboard to the Midwest. The charts, drawings, models and exhibits which both sides prepared while unquestionably helpful, were unnecessarily elaborate, perhaps even bordering on the ostentatious. Occasionally, I shared the feeling which Judge Aldrich expressed in Emerson v. National Cylinder Gas Company,[8] that Counsel:

" * * * were making the prosecution of this case as expensive as they could."

Since both parties indulged in this luxury, I see no equitable reason to award costs. See Dole Refrigeration Co. v. Amerio Contact Plate Freezers, Inc., 265 F.2d 627 (3rd Cir. 1959).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and the parties hereto.

2. Claims 1, 2 and 3 of the '202 patent are not infringed by the defendant.

3. Claims 1, 2 and 3 of the '202 patent are invalid and void as lacking invention over the prior art patents relied upon by defendant.

4. Any reliance by plaintiff on a presumption of validity, on alleged commercial success, on the alleged fulfilling of unsolved needs, and on other secondary considerations of patentability cannot be controlling where as here, the facts establish that the invention was

7. In Col. 1, line 70 et seq., the Barr patent states that "a further object of the invention" * * * is to provide a roller bearing wherein the walls of the roller-retaining slots in the cage shall loosely engage *and guide* the rollers at their ends * * *" While the guidance function of the cage may be correlated to the skewing problem prevalent in bearings of high roller length to diameter ratio, this is not set out with sufficient particularity to be regarded as a meaningful distinction between Barr and Brodin.

8. 147 F.Supp. 543, 545 (D.Mass.1957), affirmed 251 F.2d 152 (1st Cir. 1957).

940

obvious and not novel, in light of the relevant prior art. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

5. All of the accused bearings follow the teachings of the art prior to the '202 patent in structure and in operation.

6. Individual costs and attorneys' fees to be respectively borne by each party.